[Cite as *State v. Nelson*, 2023-Ohio-3566.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,                 :   CASE NO. 22CA10

    v.                                  :

KOENTAE[1] NELSON,                      :   DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.                :   **RELEASED 9/28/2023**
_____
APPEARANCES:

Christopher Bazeley, Cincinnati, Ohio for appellant.

James K. Stanley, Meigs County Prosecuting Attorney, Pomeroy, Ohio, for appellee.
_____
HESS, J.

{¶1}   Koentae Nelson appeals his convictions for aggravated murder, murder, complicity to aggravated murder or murder, conspiracy, burglary, and tampering with evidence. The aggravated murder and murder convictions included gun specifications. For his first assignment of error, Nelson contends that the state failed to follow its own chain of custody procedures for a physical piece of evidence – a cloth Crown Royal bag containing his DNA – found at the scene. He argues that the state's records show that the Crown Royal bag was checked out of the evidence room for DNA testing and never checked back in even though it was later found to be in the evidence room. Additionally, he argues the state was never able to show how the bag suddenly appeared at the crime scene. We find that Nelson

---

[1] Mr. Nelson's name is spelled a variety of different ways in court documents, including Keontae, Keonta, Keantae, and Keante. The judgment of conviction spells it Koentae, which is the spelling we adopt.

was mistaken about the chain of custody record because the record shows that there was never a breach in the chain of custody for the Crown Royal bag. And, to the extent Nelson argues that law enforcement was required to prove how the bag appeared at the scene, he cites no authority which requires law enforcement to establish the original source of evidence it discovers at a crime scene or to establish a chain of custody for evidence *before* it was discovered by law enforcement. We overrule Nelson's first assignment of error.

{¶2} In his second assignment of error, Nelson contends that his convictions for aggravated murder, murder, complicity, and conspiracy are not supported by sufficient evidence. He argues that there was insufficient evidence that he had the requisite intent required for each of the crimes. We find that Nelson's argument concerning his conviction for conspiracy is moot because, as explained below, we sustain his third assignment of error and find the indictment for conspiracy is fatally flawed and his conviction reversed. However, his convictions for aggravated murder, murder, and complicity are supported by sufficient evidence. The state presented sufficient evidence through eyewitness testimony and the coroner's testimony to allow any rational trier of fact to find all the essential elements of these crimes proven beyond a reasonable doubt. We overrule his second assignment of error.

{¶3} For his third assignment of error, Nelson contends that the indictment charging him with conspiracy to commit aggravated murder or murder is fatally defective because it failed to allege a specific, substantial act in furtherance of the conspiracy. We find this contention meritorious and sustain his third assignment of error.

{¶4} Finally, Nelson contends that his life sentence without parole is cruel and unusual punishment because he is 20 years old. We find his sentence is not disproportionate to the crime, nor does it shock the community's sense of justice. We overrule his fourth

assignment of error.

{¶5} We reverse the trial court's judgment, in part, and reverse Nelson's conviction for conspiracy to commit aggravated murder or murder. We affirm Nelson's remaining convictions and his sentence. Because the trial court merged all the offenses and sentenced Nelson only on aggravated murder, Nelson was not sentenced for the offense of conspiracy and we need not remand for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

{¶6} In June 2022, a Meigs County Grand Jury indicted Nelson with one count of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; one count of murder in violation of R.C. 2903.02(A), an unclassified felony; one count of complicity to aggravated murder or murder in violation of R.C. 2923.03(A)(2), an unclassified felony; one count of conspiracy to commit aggravated murder or murder in violation of R.C. 2923.01(A)(2), a first-degree felony; one count of burglary in violation of R.C. 2911.12(A)(1), a second-degree felony; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The grand jury also found that Nelson had a firearm on or about him while committing aggravated murder and murder and he displayed or used it to facilitate those two offenses. The indictment alleged that the offenses all occurred approximately 15 months earlier in April 2021. Nelson entered a not guilty plea.

{¶7} The case proceeded to a jury trial which produced the following evidence. In the early morning hours of April 4, 2021, Kane Roush was shot multiple times and killed. Two neighbors were awakened by the sounds of shotgun blasts. They went outside and discovered Roush on the ground covered in blood and called 9-1-1. One of the neighbors asked Roush who had shot him and Roush responded, "some black guy." The paramedics

arrived shortly thereafter and transported Roush to the hospital. During transport he experienced cardiac arrest, could not be resuscitated, and was pronounced dead shortly upon arrival at the hospital.

{¶8} The coroner testified and provided an autopsy report of the cause of death. Roush had four shotgun wounds and four gunshot wounds. One of the shotgun wounds was to the left side of the head, one was to the right upper shoulder, one was to the left upper shoulder, and one was to the left arm. There were also four gunshot wounds: one to the midline lower back that injured his small intestine, liver, and diaphragm; one to his left buttocks that injured his bladder; and two to his right lower thigh. The coroner testified that the cause of Roush's death was multiple shotgun and gunshot wounds.

{¶9} Through their investigative efforts, law enforcement determined that there were probably two to three assailants involved in the murder of Roush and perhaps one of the assailants had been shot. Inquiries made at various hospitals in the general area in both Ohio and West Virginia led them to discover that Jaquan Hall had been shot in the arm. Eventually a search of Hall's vehicle lead to the discovery of DNA evidence that matched DNA at the crime scene. Authorities obtained a warrant to swab Hall for DNA, which also showed a match to evidence at the crime scene and Hall was indicted. Hall's DNA matched the DNA profile on a pair of shorts that were found in the roadway outside Roush's residence. Hall's DNA was also a match for one of the two sets of DNA profiles found on the Crown Royal bag found at the scene, which contained an empty box of Remington shotgun shells.

{¶10} Law enforcement from the Meigs County Sheriff's Department and The Ohio Bureau of Criminal Investigation collected evidence from the scene and tested it for ballistic and DNA results. The ballistic expert determined that some of the fired cartridge cases from

the scene were fired from a 45-caliber Hi-Point firearm, one of the plastic shot wads examined was consistent as having been fired from a Remington 12-gauge shotgun, and the lead pellets were consistent with number six lead shot pellets. The DNA expert analyzed DNA from a pair of shorts found in the roadway at the crime scene, as well as DNA from a Crown Royal bag that contained an empty box of shotgun shells. The DNA from the shorts matched Hall's DNA profile at 1 in 1 trillion persons, meaning that the DNA expert would have to test 1 trillion people before he would find another person (besides Hall) to match the DNA on the shorts. There were two DNA profiles on the Crown Royal bag, one that matched Hall's DNA and one that matched Nelson's DNA. Again, the DNA on the bag matched Hall at 1 to 1 trillion and the second DNA profile on the bag matched Nelson at 1 to 10,000.

{¶11} Law enforcement also suspected that there were at least two shooters involved because there were spent 45-caliber rounds and spent shotgun shells at the scene and one assailant typically does not carry both a shotgun and a handgun. Through more investigative efforts, law enforcement determined that Koentae Nelson may have some involvement in the case and went to his work to interview him. Nelson denied all involvement and agreed to provide a DNA swab. Nelson's DNA evidence matched the DNA on evidence from the crime scene – specifically the other DNA profile found on the Crown Royal bag. Nelson was arrested. Additional interviews with Nelson led to the discovery of Richard Walker's involvement in the case. Nelson admitted that he and Walker were at Roush's residence in the early morning hours in question, but his description of events did not match up with the evidence at the crime scene.

{¶12} Law enforcement arrested Richard Walker. Walker agreed to enter a guilty plea to conspiracy and burglary with a prison term of 15 to 20 1/2 years in exchange for his truthful

testimony at the trials of Hall and Nelson.

{¶13} Walker testified that he, Hall, and Nelson were friends in the same rap band together and hung out together making music and playing video games. About a week before Roush's murder, the three of them were together at Nelson's house when Hall and Nelson started talking about killing Roush because Hall suspected that Roush was "snitching" on him. Both Hall and Nelson wanted to kill Roush for what they believed was "snitching." Nelson told Hall that he would kill Roush. On the night of the murder, Hall contacted Walker and asked him to come over because "we have to go handle something." The three of them drove to Pomeroy, Ohio, which was about an hour drive from where they lived in Charleston, West Virginia. Walker believed that they were going there to kill Roush, he did not think they were going to rob him of money or marijuana. When they arrived, Hall took out a 12-gauge shotgun and Nelson took out a 45-caliber from the trunk of the car. Walker had an inoperable black and pink gun. They all approached Roush's house and Nelson knocked on the door and asked to borrow Roush's phone. At that point, Hall rushed forward and hit Roush with the butt end of the shotgun causing Roush to stumble backward. Walker held Roush at gunpoint while Hall and Nelson searched his apartment for guns, money, and drugs. Nelson found $500 dollars in Roush's wallet and gave Walker $200 and kept $300 for himself. They also took Roush's cell phone.  After they finished the search of Roush's house, Hall told Nelson, "You know what to do" which meant that Nelson was to shoot Roush. Nelson shot Roush three or four times as Roush tried to run out the door. One of the bullets Nelson fired hit Hall in the right arm. Walker and Nelson started running back to their car as Roush continued to crawl away. Hall stayed back and shot Roush at least two more times with the shotgun. Walker drove, Nelson was in the passenger side, and Hall, who arrived last, was in the

backseat. They drove back to Charleston, tossing the wallet and cellphone out the car window along the way. They also stopped once to get bandages for Hall's arm and once to get gas. After they returned to Charleston, they parted ways and Walker did not see or talk to Nelson or Hall again.

{¶14}  The jury found Nelson guilty on all charges including the firearms specifications and the trial court sentenced him to three years on the firearm specifications, merged all counts, and sentenced him on the aggravated murder conviction to life in prison without possibility of parole. Nelson appealed.

## II. ASSIGNMENTS OF ERROR

{¶15}  Nelson assigns four errors for review:

> I. The state failed to follow its own regulations regarding the chain of custody for the sole piece of physical evidence that Nelson was on the scene.
>
> II. Nelson's convictions for aggravated murder, murder, complicity, and conspiracy are not supported by legally sufficient evidence.
>
> III. The indictment charging Nelson with a conspiracy to commit aggravated murder or murder is fatally defective.
>
> IV. The sentence of life imprisonment without opportunity for parole of a twenty-year-old man is cruel and unusual punishment under the Eighth Amendment.

## III. LEGAL ANALYSIS

### A. Chain of Custody of the Crown Royal Bag

{¶16}  Nelson contends that the sole piece of physical evidence linking him to the crime scene was DNA found on a Crown Royal bag found at the scene. He argues that not only did the state fail to follow its own chain of custody procedures, but it failed to establish

how the bag was placed at the scene. As a result, he contends that it is likely the bag could have been modified or tampered with.

## 1. Standard of Review

**{¶17}** "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). " 'Chain of custody is an aspect of the authentication and identification mandate set forth in Evid.R. 901' and any 'breaks in the chain of custody go not to the admissibility of the evidence, but to the weight afforded it.' " *State v. Woltz*, 2017-Ohio-9042, 101 N.E.3d 507, ¶ 16 (4th Dist.), quoting *State v. Corder*, 2012-Ohio-1995, 969 N.E.2d 787, ¶ 15 (4th Dist.). The fact that the chain of custody is broken will not alone render the evidence inadmissible. *Corder* at ¶ 15. " 'The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' " *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 44, quoting *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus; *State v. McCoy,* 4th Dist. Pickaway No. 19CA1, 2020-Ohio-1083, ¶ 20. "Thus, absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence." *McCoy* at ¶ 20. An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

**{¶18}** The state has the burden of establishing the chain of custody of a specific piece of evidence. "The state need only establish that it is reasonably certain that substitution, alteration[,] or tampering did not occur." *State v. Blevins,* 36 Ohio App.3d 147, 150, 521

N.E.2d 1105 (10th Dist.1987). "The state, therefore, is not required 'to negate all possibilities of substitution or tampering.' " *State v. Lenoir,* 5th Dist. No. 10CAA010011, 2010-Ohio-4910, ¶ 19, quoting *State v. Moore,* 47 Ohio App.2d 181, 183, 353 N.E.2d 866 (9th Dist.1973).

### 2. Evidentiary Analysis

**{¶19}** Nelson argues that the state failed to establish a reasonable degree of certainty that substitution, alteration, or tampering with the bag did not occur because the bag was sent to BCI in April 2021 and was brought back to Meigs County in July 2021. Nelson contends that an officer checked the bag out in April but never properly checked the bag back in in July 2021. Additionally, Nelson contends that the state's witnesses testified that the bag was on the hood of a police cruiser at the scene and none of the investigating officers could testify how the bag came to be there.

**{¶20}** Meigs County Sheriff Deputy Scott Spiker testified that he and several other officers were called to the scene early that morning. Deputy Spiker spoke to Kane Roush, who was on the neighbor's porch, and then left Roush with another officer while he went to investigate Roush's residence. After they cleared Roush's residence, Deputy Spiker and two other officers went back to where their cruisers were parked. He and the other two officers collected evidence that was laying on the ground and bagged it up to preserve it. Deputy Spiker recalled collecting some shotgun shells and a pair of black shorts. Those items were placed in a bag and locked in the trunk of Deputy Spiker's cruiser. Later Deputy Spiker moved his cruiser to a nearby parking area, removed the evidence bag from his trunk, and turned it over to BCI personnel who had arrived at the scene. After he turned the evidence bag over to BCI, Deputy Spiker returned to his cruiser and saw a Crown Royal bag sitting on the hood of his cruiser. It had not been there previously, he did not know who put it there, and he did

not see any individuals around his cruiser at the time. He did not touch the bag and could see inside the bag slightly what appeared to be a box of shotgun shells. He notified Sergeant King and Sergeant King and BCI Special Agent Matthew Austin photographed the bag.

{¶21} Agent Austin testified that he took a photograph of the Crown Royal bag sitting on the cruiser's hood. The bag contained an empty box of Remington Nitro Turkey 12-gauge shotgun shells. Agent Austin turned the evidence he collected, photographed, and logged, including the Crown Royal bag, over to Meigs Sheriff Deputy Riley. Deputy Riley testified that he collected the evidence, including the Crown Royal bag, from Agent Austin and turned it over to Deputy Barnhart. Deputy Barnhart testified that he transferred the evidence he collected from Deputy Riley over to Sergeant Mohler.

{¶22} Meigs County Deputy Sheriff Myers[2] testified that he was an evidence technician for the Meigs County Sheriff's Department and Sergeant Mohler checked the Crown Royal bag into the evidence room on April 5, 2021. Deputy Myers transported it to BCI on April 20, 2021. He then received it back from BCI on July 8, 2021 and transferred it to Deputy Dillard who placed it in the evidence room. Deputy Dillard also testified that he transferred evidence given to him by Deputy Myers into the evidence room and later checked it out to Deputy Riley for use in the court proceedings. BCI Forensic Scientist Shepler testified that he tested the swab from the Crown Royal bag and the DNA on the bag matched Nelson's DNA with a statistical significance of 1/10,000 unrelated individuals.

{¶23} Contrary to Nelson's contention, the state's witnesses and evidence logs do not show any break in the chain of custody of the Crown Royal bag. Not only does the

---

[2] The trial transcript has Deputy Myers name as "Meyers" however exhibits from the Meigs County Sheriff's Office and BCI both spell it "Myers."

witnesses' testimony provide an unbroken chain of custody, but the evidence logs and chain of custody reports show that the Crown Royal bag was collected by Agent Austin and submitted to the evidence room by Deputy Mohler, accepted into the evidence room by Deputy Myers, checked out to BCI for DNA testing and then checked back in by Deputy Myers when it was returned from BCI in July 2021. Then, in September 2022, the Crown Royal bag was checked out by Deputy Dillard for use in the trial of Jaquan Hall.

{¶24} The BCI chain of custody report shows that the Crown Royal bag was received by them from Deputy Myers, swabbed by Agent Maldonado, DNA analyzed by Agent Shepler, and returned to the Meigs County Sheriff's Department in July 8, 2021, which also matched the custody log maintained by Deputy Myers, who checked it back in to the evidence room on July 8, 2021.

{¶25} We have cross-referenced all the witnesses' testimony against the chain of custody and the evidence and find that Nelson is mistaken about the Crown Royal bag's break in the chain of custody. The portion of the trial testimony from Deputy Dillard that Nelson contends shows a break in the chain of custody for the Crown Royal bag, which was evidence number 21-0818-1-1, was Deputy Dillard's testimony about a fired shotgun shell, identified as evidence number 21-0818-3-1 and was described as "One fired green Nitro Turkey shotgun shell found by Sgt. Mohler in roadway near [the victim's house]."

{¶26} Nelson also argues that the state failed to provide any evidence as to the source of the Crown Royal bag "other than it mysteriously appeared on the hood of Deputy Spiker's police cruiser." Witnesses testified that they collected evidence from various locations at the crime scene, including the grounds and roadways, porches, vehicles, garage doors, and the victim's bedroom, basement, living room, and kitchen. Much evidence was

strewn upon the ground and roadway and was collected and temporarily secured in police cruisers to prevent emergency vehicles from running over it. However, none of the witnesses put, or saw anyone else put, the Crown Royal bag on the hood of the cruiser. And none of the witnesses saw anyone near Deputy Spiker's cruiser at any time during the investigation. Nelson argues that because the state was unable to determine the source of the Crown Royal bag, they could not establish that it was not altered or tampered with before they discovered it. However, this is true for all the evidence at most crime scenes. Nelson provides no legal authority that imposes such an onerous and impossible obligation upon the state. Between the time a crime is committed and the time the police arrived, the scene is usually unsecured and subject to possible alteration. Furthermore, when law enforcement arrived at the scene, they had no way of knowing how various evidentiary items came to be strewn about in the various locations in which they were found. Because the Crown Royal bag inexplicably appeared on the police cruiser's hood, Nelson's counsel could and did argue against the jury giving it much weight: "The only DNA of [Nelson] that they found was the magical Crown Royal bag. You know, the one that just appeared? Take that into consideration. Where did it come from? How did it get there?"

{¶27} From the time law enforcement discovered the Crown Royal bag up until trial, the bag was secured, and the chain of custody was unbroken. Any break in the chain of custody goes to the weight of the evidence not its admissibility. The trial court did not act unreasonably, arbitrary, or unconscionable when it overruled Nelson's evidentiary objection to the Crown Royal bag or the DNA collected from it.

{¶28} We overrule Nelson's first assignment of error.

### B. Sufficiency of the Evidence for
### Aggravated Murder, Murder, Complicity, and Conspiracy

{¶29} In his second assignment of error, Nelson contends that his conviction for aggravated murder, murder, complicity, and conspiracy were not supported by sufficient evidence. As we explain in addressing Nelson's third assignment of error, the indictment for conspiracy to commit aggravated murder or murder fails to allege a specific substantial overt act in furtherance of the conspiracy. His conviction for conspiracy is reversed thus we need not consider whether the state presented sufficient evidence.

### 1. Standard of Review

{¶30} "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Bennington,* 2019-Ohio-4386, 148 N.E.3d 1, ¶ 11 (4th Dist.).

{¶31} An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 22, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *State v. Davis*, 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring).

Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

### 2. Elements of Aggravated Murder

{¶32}   The jury convicted Nelson of aggravated murder in violation of R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." Nelson argues that the state did not introduce sufficient evidence that he acted with prior calculation and design.

{¶33}   "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.2d 1124, ¶ 18.   Courts generally consider three factors to determine whether a defendant acted with prior calculation and design: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? And (3) Was the act drawn out or an almost instantaneous eruption of events? *Walker* at ¶ 20. Although these factors provide guidelines, there is no bright-line test for prior calculation and design, and each case instead turns upon the evidence introduced at trial. *Walker* at ¶ 19; *State v. Phillips,* 4th Dist. Scioto No. 18CA3832, 2018-Ohio-5432, ¶ 28.

{¶34}   The state presented evidence through the testimony of Richard Walker, who testified that the murder of Roush was a planned event. Walker testified that approximately

a week before the murder, Walker, Nelson, and Hall were together at Nelson's house. Nelson and Hall were discussing plans to kill Roush because Hall and Nelson believed that Roush was "snitching" on Hall. Walker testified that Nelson had agreed to kill Roush. Walker testified that it was approximately an hour drive from Charleston, West Virginia where Nelson, Hall, and Walker lived to Pomeroy, Ohio where Roush lived. Walker testified that about a week later, the three of them drove to Pomeroy because Nelson and Hall were going to kill Roush. That was the only reason for their trip. Walker testified that Hall was driving and parked in a lot across from Roush's residence. After arriving in Pomeroy, Hall and Nelson "pulled out guns" – Hall had a 12-gauge shotgun and Nelson had a 45 caliber Hi-Point firearm. Walker had an inoperable pink and black gun.

{¶35} Walker testified that they all walked up to Roush's house. Nelson approached Roush's door, knocked, and asked to borrow the phone as a ruse so that Roush would open the door. At that point, Hall came up the steps to the door and hit Roush with the butt end of the shotgun. Roush stumbled backwards, and Nelson, Hall, and Walker went into Roush's house. Walker testified that he guarded Roush while Nelson and Hall began searching for marijuana because Roush used to give Hall marijuana to sell. They also took Roush's wallet, phone, and a black gun. There was $500 in Roush's wallet which Nelson and Walker split, $300 and $200 respectively. After they searched Roush's house, Hall told Nelson, "You know what to do" meaning Nelson was to shoot Roush. Nelson shot Roush three or four times in the back as Roush tried to run outside. One of Nelson's bullets hit Hall in the right arm. Walker and Nelson ran back to the car and Hall shot Roush twice with the shotgun as he attempted to crawl away. After Hall returned to the car, Walker drove everyone back to Charleston, West Virginia, stopping once to get bandages for Hall's arm where Nelson had shot him and

once for gas.

**{¶36}** On cross-examination, Walker was asked, "And you actually weren't present for any conversation between Keontae [sic] [Nelson] and Jaquan [Hall] regarding the actual killing of anyone, were you?" and he responded, "Correct." However, Walker clarified that he was there for the conversation he described in his earlier testimony, which occurred at Nelson's house.

**{¶37}** Deputy Coroner Richmond testified that Roush died from multiple gunshot and shotgun wounds.

**{¶38}** The state presented sufficient evidence of prior calculation and design through the testimony of Walker, who testified that Hall and Nelson planned to murder Roush approximately a week before they did so. Even though it was not established whether Nelson knew Roush personally, through Walker's testimony the state established that Nelson believed Roush was "snitching" on Hall and thus he had a negative or strained attitude toward him. Nelson agreed to Hall's plan to murder Roush and travelled with guns on an hour-long car trip to Roush's house. When Hall told Nelson, "You know what to do," Nelson immediately began shooting Roush at least four times with a 45-caliber handgun. After viewing this evidence in a light most favorable to the prosecution any rational trier of fact could have found the essential elements of aggravated murder proven beyond a reasonable doubt. The jury's aggravated-murder conviction was supported by sufficient evidence.

### 3. Elements of Murder

**{¶39}** The jury convicted Nelson of murder in violation of R.C. 2903.02(A) which states "(A) No person shall purposely cause the death of another * * * ."  Under R.C. 2901.22(A) "A person acts purposely when it is the person's specific intention to cause a

certain result,* * *." Nelson contends that the state failed to show that he acted with the intent to kill Roush because the evidence shows that Nelson's shots did not hit any of Roush's "critical organs" or head.

**{¶40}** However, the state presented evidence that Nelson went to Roush's house with the intent to kill Roush and shot Roush multiple times from a short distance with a 45-caliber firearm while Roush attempted to flee out the door. Whether Nelson managed to hit what he calls "critical organs" while Roush fled is not relevant; two of the 45-caliber gunshot wounds were in Roush's lower back region, with one puncturing his liver, and two gunshot wounds were in his right thigh. The coroner testified that it was a combination of these four wounds combined with the four shotgun wounds that caused Roush's death.

**{¶41}** After viewing this evidence in a light most favorable to the prosecution any rational trier of fact could have found the essential elements of murder proven beyond a reasonable doubt. The jury's murder conviction was supported by sufficient evidence.

### 4. Elements of Complicity

**{¶42}** The jury convicted Nelson of complicity to commit aggravated murder or murder under R.C. 2923.03(A)(2), which states, "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense; * * *."   "[T]o aid or abet is ' "[t]o assist or facilitate the commission of a crime, or to promote its accomplishment." ' " *State v. McFarland,* 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 27, quoting *State v. Johnson*, 93 Ohio St.3d 240,243, 754 N.E.2d 796 (2001), quoting Black's Law Dictionary 69 (7th Ed.1999); *State v. Foster*, 4th Dist. Scioto No. 21CA3967, 2023-Ohio-746, ¶ 31.

> A conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2) requires the state to prove, beyond a reasonable doubt, "that the defendant

supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " However, " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." (Citations omitted.)

*State v. Whitehead*, 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 81.

**{¶43}** Nelson appears to concede that he was aiding Hall, who he describes as the "principal in this offense." However, he argues that the state failed to show that he acted with the same murderous intent as Hall did. However, we have already determined that Nelson acted purposely when he caused the death of Roush for purposes of the murder conviction and that he acted with prior calculation and design for purposes of the aggravated murder conviction. Thus, the state established that Nelson acted with the kind of culpability required for the commission of aggravated murder and murder. Walker's testimony also established that Nelson aided Hall. Nelson assisted Hall in the murder by obtaining entry into Roush's house by feigning a need to borrow a phone and he assisted Hall when Nelson shot Roush multiple times as Roush attempted to flee.

**{¶44}** Based on our review, when viewed in a light most favorable to the prosecution, the evidence demonstrates that Nelson was more than an innocent bystander to the offenses, and instead, establishes that he had the requisite intent and aided Hall in committing the offenses of aggravated murder and murder.

**{¶45}** We overrule Nelson's second assignment of error.

C. Defect in Indictment for Conspiracy to Commit Aggravated Murder or Murder

**{¶46}** For his third assignment of error, Nelson contends that the indictment charging

him with conspiracy to commit aggravated murder or murder is fatally defective because it "must allege some specific, substantial, overt act performed in furtherance of the conspiracy." Nelson argues that the indictment merely restates the statutory language of R.C. 2923.01 (conspiracy), but it fails to allege any specific act that he committed in furtherance of the conspiracy as required by R.C. 2923.01(B).

{¶47} The adequacy of an indictment is a question of law, which we review de novo. *State v. Troisi*, 169 Ohio St.3d 514, 2022-Ohio-3582, 206 N.E.3d 695, ¶ 17.

{¶48} The indictment charges conspiracy in violation of R.C. 2923.01(A)(2), which states:

> (A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, * * * shall do either of the following:
> *       *       *
> (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
>
> (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

The indictment states the conspiracy count in Count Four:

> That **KEONTAE NELSON**, on or about the 4th day of April 2021, in the County of Meigs and State of Ohio, aforesaid, did commit the crime of **CONSPIRACY**, in that Keontae Nelson, did, with purpose to commit or to promote or facilitate the commission of aggravated murder or murder, agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses, in violation of Section 2923.01(A)(2) of the Ohio Revised Code, A FELONY OF THE FIRST DEGREE, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio. (OR 2)

{¶49} To meet constitutional requirements, an indictment must (1) contain the elements of the offense charged and fairly inform the defendant of that charge and (2) enable

the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *State v. Childs*, 88 Ohio St.3d 558, 565, 2000-Ohio-425, 728 N.E.2d 379 (*Childs II*). "An indictment must charge a criminal offense ' "with reasonable certainty * * * so as to apprise the defendant of that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try, and the court may determine without unreasonable difficulty what evidence is admissible." ' " *State v. Lambert,* 2017-Ohio-4310, 82 N.E.3d 29, ¶ 11 (4th Dist.), quoting *State v. Horner,* 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 10, quoting *Horton v. State,* 85 Ohio St.13, 19, 9 N.E. 797 (1911).

**{¶50}** Generally, the requirements of an indictment may be met by reciting the language of the criminal statute. *State v. Childs,* 88 Ohio St.3d 194,199, 2000-Ohio-298, 724 N.E.2d 781 (*Childs I*).[3] However, the conspiracy statute requires more than a mere recitation of the exact wording of the statute defining the offense of conspiracy; it requires an allegation and proof of a substantial overt act in furtherance of the conspiracy:

> R.C. 2923.01(B) provides that no person shall be convicted of the crime of conspiracy unless a substantial overt act is "alleged and proved." Clearly, this section of the Revised Code requires that the substantial, overt act not only be proved, but also alleged in the indictment. If the statute did not require that the substantial, overt act be both alleged and proved by the state, it would not contain the word "alleged."

*Id.* at 199 (finding the "state's failure to allege a specific, substantial, overt act committed in furtherance of the conspiracy in count fourteen of the indictment against Childs renders the indictment invalid" even though the indictment tracked the language that "a substantial overt

---

[3] There are two *Childs* cases involving errors in conspiracy indictments. The cases involved a husband and wife team of corrupt Dayton police officers. In the husband's case, *Childs I*, the Supreme Court of Ohio found the conspiracy indictment fatally flawed because it failed "to allege at least one specific, substantial, overt act in furtherance of the conspiracy." *Id.* at 197. In the wife's case, *Childs II*, the Court held that her indictment for conspiracy to commit aggravated trafficking was sufficient because it did allege specific, substantial overt acts in furtherance of the conspiracy and it did not have to recite the specific controlled substance involving in the underlying offense of aggravated trafficking. *Id.* at syllabus paragraph one.

act was done by" the defendant); *State v. Lambert*, 2017-Ohio-4310, 82 N.E.3d 29, ¶ 37 (4th Dist.) (where "indictment simply alleges the 'generic' 'plan or aid in planning' language contained in R.C. 2923.01(A)(1), without any allegation that she engaged in a substantial overt act in furtherance of the conspiracy" it fails "the substantial-overt-act requirement" and appellant's conviction on conspiracy is reversed).

{¶51} Moreover, a bill of particulars that sets forth the nature of the charges and the specific conduct constituting the crimes charged does not cure the defect in the indictment. *Lambert* at ¶ 15; *Childs I* at 198 (fatal flaw in the conspiracy indictment cannot be cured by the bill of particulars, "the bill of particulars is not signed by the grand jury foreman, and there is no evidence that the material contained in the bill of particulars was ever presented to the grand jury").

> The material and essential facts constituting an offense are found by the presentment of the grand jury; and if one of the vital and material elements identifying and characterizing the crime has been omitted from the indictment such defective indictment is insufficient to charge an offense, and cannot be cured by the court, as such a procedure would not only violate the constitutional rights of the accused, but would allow the court to convict him on an indictment essentially different from that found by the grand jury.

*Harris v. State*, 125 Ohio St. 257, 264, 181 N.E. 104 (1932). Though Nelson requested a bill of particulars, the state did not provide one.

{¶52} Here, the indictment fails to allege a substantial overt act as required by R.C. 2923.01(B). The state concedes that "Count Four does not contain the language of ORC § 2923.01(B)" but it argues that Nelson has waived this error by failing to raise it by motion under Crim.R. 12(C)(2). However, Crim.R. 12(C)(2) carves out motions based on defects in the indictment that fail to charge an offense from those motions that must be raised before trial:

(C) Pretrial Motions. Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:

*                    *                    *

(2) Defenses and objections based on defects in the indictment, information, or complaint (**other than failure** to show jurisdiction in the court or **to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding**); * * *. (Emphasis added.)

**{¶53}** The Supreme Court of Ohio has generally held that a criminal defendant's failure to object to the indictment before or at trial waives any defect in the indictment. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 46 ("failure to timely object to a defect in an indictment constitutes a waiver of the error"). However, in *Childs I, supra,* the Ohio Supreme Court did not follow that general rule and instead affirmed an appellate court decision vacating the defendant's conviction for conspiracy because of a defective indictment. It did so even though the defendant failed to object to any deficiency in the indictment before trial. *Childs I*, 88 Ohio St.3d 194, 200.

**{¶54}** The appellate court in *Childs I* recognized the exception we emphasized above in Crim.R. 12(C)(2) for defects in the indictment that fail to charge an offense. It rejected the state's argument that the appellant had waived the defect in the indictment by failing to raise it before trial. Instead the appellate court found that the failure to allege a substantial overt act in furtherance of the conspiracy was a "failure to charge an offense" and could be raised at any time during the proceedings. *State v. Childs*, 2d Dist. Montgomery No. 16325, 1998 WL 598102, *5, aff'd, 88 Ohio St.3d 194, 724 N.E.2d 781 (2000) (involving husband Charles Childs).

**{¶55}** Similarly, the Seventh District Court of Appeals rejected the state's argument that this type of indictment error was waived when it was not raised in a Crim.R. 12(C)(2)

motion. *State v. Bundy*, 7th Dist. Mahoning No. 02 CA 211, 2005-Ohio-3310, ¶ 15-18. The

appellate court in *Bundy* reviewed the *Childs I* case and determined that the only way to

reconcile the Supreme Court of Ohio's decision in *Childs I* is to find that the failure to allege

a substantial overt act as required by R.C. 2923.01(B) constitutes a "failure to charge an

offense" and can be raised at any stage of the proceedings:

> Because the general rule both before and after the Ohio Supreme Court's decision in *Childs* is that a defendant waives an objection to the indictment if it is not raised before trial, the only way to reconcile *Childs* with this case law is to assume that it adopted the Second District's rationale and agreed that this particular type of deficiency is a "failure to charge an offense." Thus, Bundy could not have waived this objection to the indictment by not making that objection prior to trial. Accordingly, the state's arguments to the contrary are without merit.

*Bundy* at ¶ 18.

{¶56} We have also rejected a claim that this error must be raised in a Crim.R.

12(C)(2) motion or it is waived. *State v. Lambert*, 2017-Ohio-4310, 82 N.E.3d 29, ¶18-19, fn.

1 (4th Dist.). In *Lambert*, the indictment suffered from the same defect that Nelson's

indictment suffers -- it failed to allege a specific, substantial overt act in furtherance of the

conspiracy.

> In the case sub judice, appellant's indictment not only suffers from the same defect as the indictment in *Childs* (i.e., it fails to allege a specific, substantial, overt act), but it also fails to recite "the generic words of the statute." *Id.* at 198, 724 N.E.2d 781. Nowhere in appellant's indictment do the words "substantial overt act in furtherance of the conspiracy" appear. Thus, appellant's indictment is arguably more deficient than the *Childs* indictment. Furthermore, as in *Childs*, the record in the case at bar contains no evidence that the grand jury considered whether appellant performed a substantial overt act in furtherance of the conspiracy.
>
> Moreover, although appellant did not object to the indictment during the trial court proceedings, according to the *Childs* court her failure to timely object does not prevent a mandatory reversal. Thus, under the reasoning and holding in *Childs*, appellant's indictment is fatally defective and we must reverse her conviction

*Lambert* at ¶ 18-19.

{¶57}  The state also argues that even though the conspiracy count in the indictment does not allege a specific substantial overt act Nelson allegedly took in furtherance of the conspiracy, the indictment when taken as a whole, contains a specific, substantial act performed by Nelson in furtherance of the conspiracy. The state argues that *Childs I* does not require that the conspiracy *count* itself contain the allegation of a specific, substantial overt act in furtherance of the conspiracy as long as that allegation can be found somewhere in the *indictment.* However, the state points to no allegation anywhere in the indictment that alleges a specific, substantial overt act Nelson performed in furtherance of the conspiracy. Instead, the state argues that because the indictment included counts for aggravated murder and murder, then the "language of the indictment made it clear that the Conspiracy to Commit Aggravated Murder or Murder Count was directly related to the Aggravated Murder Count and the Murder Count." In other words, the aggravated murder and murder counts, which track the statutory language for those crimes, was the specific, substantial overt act Nelson did in furtherance of the conspiracy to commit aggravated murder or murder.

{¶58}  The state confuses the elements of conspiracy with the underlying crime of aggravated murder or murder. The allegations that Nelson committed aggravated murder and murder are the *underlying offenses* Nelson was alleged to have conspired to commit. They are not the "substantial overt act in furtherance of the *conspiracy.*" The conspiracy alleged here was under R.C. 2923.01(A)(2): "Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses." Nowhere in the indictment did the state allege a specific, substantial overt act in furtherance of this conspiracy. There is nothing alleging he had conversations with another,

sent text messages, or otherwise agreed with another and there are no allegations stating with whom it was that Nelson was allegedly conspiring. Counts in the indictment alleging aggravated murder and murder *go to the underlying object crime of the conspiracy* and do not allege a specific, substantial overt act in furtherance of the conspiracy. *Childs II*, 88 Ohio St.3d 558, 565 (distinguishing between the crime of conspiracy and the underlying or "object crime" of aggravated drug trafficking).[4] " 'The object crime, while important, is secondary, and need not be described' with particularity." *Childs II* at 565.

{¶59} We find that the flaws in Nelson's indictment are the same as the flaws in *Lambert's* indictment. In *Lambert*, the defendant was indicted with two counts of conspiracy to commit aggravated murder in violation of R.C. 2923.01. The only difference between Nelson's indictment and Lambert's was that Nelson was indicted under R.C. 2923.01(A)(2) and Lambert under R.C. 2923.01(A)(1). Lambert's indictment read:

> On or about the 21st day of July, 2015 through the 28th day of July, 2015, at the County of Pickaway, or by some manner enumerated in Section 2901.12 of the Ohio Revised Code whereby proper venue is placed in the county aforementioned, Tara J. Lambert, did with purpose to commit, promote or facilitate the commission of Aggravated Murder with another person, plan or aid in planning the commission of such offense;
>
> Contrary to and in violation of Section 2923.01(A)(1) of the Ohio Revised Code and being a Felony of the First Degree, being against the peace and dignity of the State of Ohio.

---

[4] In *Childs II* (involving the wife, Dineah Childs), the conspiracy indictment alleged in Count Fourteen: "a substantial overt act was done by each defendant or a person with whom they conspired in that Dineah Childs and Sean Pauley engaged in a series of telephone conversations in which Dineah Childs and Sean Pauley coordinated arrangements for the transferring of narcotics from Charles Childs to Sean Pauley and in which the availability, the nature and the need for the immediate transfer of the narcotics was discussed; these conversations also entailed the need to transfer the financial proceeds of these transactions from Sean Pauley to Charles Childs* * *." *State v. Childs*, 2nd Dist. Montgomery No. 16580, 1998 WL 801326, *4, aff'd in part, rev'd in part, 88 Ohio St.3d 558, 728 N.E.2d 379 (2000). Our decision in *Lambert* recited both the indictment's conspiracy Count Fourteen and Count Fifteen in *Childs II,* which included similarly specific overt acts. *Lambert* at ¶ 23-24.

*Lambert* at ¶ 2. The *Lambert* indictment tracked the language of R.C. 2923.01(A)(1) just as the Nelson indictment tracked the language of R.C. 2923.01(A)(2). Neither indictment included allegations of a specific substantial overt act in furtherance of the conspiracy as required by R.C. 2923.01(B) and *Childs I*. Moreover, here, unlike *Lambert*, Nelson did not receive a bill of particulars, making Nelson's case more egregious than both *Childs I* (which alleged "a substantial overt act was done" but did not specifically detail any overt act done in furtherance of the conspiracy – its fatal omission, but included a bill of particulars) and *Lambert* (which neither tracked the R.C. 2923.01(B) language nor alleged any details of any overt act, but included a bill of particulars). In *Lambert* we gave examples of the type of substantial overt act that might have been included in the indictment but was not, such as "that she discussed murder-for-hire with anyone, that she paid anyone money to commit murder, or that she sent any letters regarding murder-for-hire. Instead * * * appellant's indictment simply alleges the 'generic' 'plan or aid in planning' language  contained in R.C. 2329.01(A)(1), without any allegation that she engaged in a substantial overt act in furtherance of the conspiracy."  *Lambert* at ¶ 37.

{¶60} We find that the indictment alleging Nelson conspired to commit aggravated murder or murder was fatally flawed. We sustain Nelson's third assignment of error and reverse Nelson's conviction on conspiracy to commit aggravated murder or murder.

### D. Sentence of Life Imprisonment Without Parole

{¶61}   Nelson contends that his sentence violates the Eighth Amendment prohibition against cruel and unusual punishment because he was 20 years old at the time he committed aggravated murdered and "sentencing such a young man to a term of life imprisonment without any hope of release is extreme and cruel" under the Eighth Amendment of the United

States Constitution and Section 9, Article I, of the Ohio Constitution.

{¶62} The state argues that Nelson was sentenced in accordance with the statutory provisions governing the penalties for aggravated murder, which include life without parole. The state points out that Nelson failed to cite to any case law, either federal or state, which has held that a life sentence without parole is unconstitutional.

{¶63} Review of felony sentences is governed R.C. 2953.08. Subsection R.C. 2953.08(D)(3) prevents review of sentences imposed for aggravated murder: "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." However, the Supreme Court of Ohio has held that this statutory prohibition against review of aggravated murder and murder sentences "does not preclude an appeal of a sentence for aggravated murder or murder that is based on constitutional grounds." *State v. Patrick,* 164 Ohio St.3d 309, 2020-Ohio-6803, 172 N.E.2d 952, ¶ 22. *Patrick* also held that age is a relevant sentencing factor under R.C. 2929.12 when a trial court sentences a *juvenile* offender. *Id.* at ¶ 27.

{¶64} Nelson concedes he was a 20-year-old adult man, not a juvenile, when he committed aggravated murdered. Therefore, we find the case law governing the sentencing of juveniles and the requirement to consider their age to be irrelevant. *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 12 ("children are constitutionally different from adults for purposes of sentencing"). Moreover, even juveniles may be sentenced to life in prison without the possibility of parole without running afoul of the Eighth Amendment. *Jones v. Mississippi*, 209 L.Ed.2d 390, 141 S.Ct. 1307, 1311 (2021) (a juvenile who commits a homicide may be sentenced to life without parole, but only if the sentence is not mandatory and the trial court has discretion to impose a lesser punishment – a finding of permanent

incorrigibility is not required); *State v. Ramsay,* 9th Dist. Medina No. 19CA0016-M, 2021-Ohio-2870, ¶ 15 (juvenile sentenced to life without parole for murder of 98-year-old woman after breaking into her home).

{¶65} Nelson fails to explain how his sentence is cruel and unusual punishment under the U.S. or Ohio Constitutions. The Supreme Court of Ohio has summarized this constitutional requirement as one that forbids extreme sentences that are grossly disproportionate to the crime and shocks the sense of justice of the community:

> The Eighth Amendment to the United States Constitution applies to the states pursuant to the Fourteenth Amendment. The amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Section 9, Article I of the Ohio Constitution sets forth the same restriction: "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted."

> In *State v. Weitbrecht* (1999), 86 Ohio St.3d 368, 715 N.E.2d 167, we applied Justice Kennedy's Eighth Amendment analysis in his concurring opinion in *Harmelin v. Michigan* (1991), 501 U.S. 957, 997, 111 S.Ct. 2680, 115 L.Ed.2d 836. We quoted with approval his conclusion that " '[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " We further emphasized that " 'only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality' " may a court compare the punishment under review to punishments imposed in Ohio or in other jurisdictions.

> With respect to the question of gross disproportionality, we reiterated in *Weitbrecht* that " '[c]ases in which cruel and unusual punishments have been found are limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person,' " and furthermore that " 'the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.' "

(Citations omitted.) *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 12-14.

{¶66} Nelson does not allege that his sentence is grossly disproportionate to the crime of aggravated murder or that it is shocking to a reasonable person. We find that

Nelson's life sentence without parole is not grossly disproportionate to the offense of aggravated murder – others have been similarly sentenced for aggravated murder without shocking the community's sense of justice. *State v. Gardner*, 2022-Ohio-2725, 193 N.E.3d 1156 (12th Dist.) (defendant plead guilty to aggravated murder and conspiracy to commit aggravated murder, as well as an accompanying firearm specification and was sentenced to life without the possibility of parole). Nelson agreed to plan out and execute the murder of a person who had not harmed him, threatened him, and whom he may not have even known. Nelson agreed to murder Roush for the simple reason that he thought Roush may have "snitched" on his friend Hall. Nelson had a week plus an hour-long car ride to consider his actions. When he got there, he pretended to be someone in need so that Roush would sympathize, open the door to him, and lend him a phone. After ransacking Roush's home and stealing $500, he then repeatedly shot Roush with a 45-caliber firearm from a short distance while Roush attempted to flee from him. The gunshot wounds Nelson inflicted, along with those from Hall's shotgun, killed Roush. Nelson's sentence is not unconstitutional.

{¶67} We overrule Nelson's fourth assignment of error.

### IV. CONCLUSION

{¶68} We overrule Nelson's first, second, and fourth assignments of error. We sustain Nelson's third assignment of error. We reverse Nelson's conviction for conspiracy and affirm his remaining convictions for aggravated murder, murder, complicity, burglary, and tampering with evidence and the related gun specifications. Because the trial court merged all the offenses and sentenced Nelson only on aggravated murder, Nelson was not sentenced for the offense of conspiracy. Thus, even though we reverse the conspiracy conviction, we need not remand for resentencing because Nelson was not separately sentenced for this offense.

JUDGMENT REVERSED IN PART
AND AFFIRMED IN PART.

JUDGMENT ENTRY

It is ordered that the judgment be reversed in part and affirmed in part. Appellant to pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY:_____
          Michael D. Hess, Judge


NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.